UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

SUNSTONE BEHAVIORAL HEALTH, INC.,

      Plaintiff,

  v.

ALAMEDA COUNTY MEDICAL CENTER,

      Defendant.

NO. CIV. S-06-2664 FCD DAD

MEMORANDUM AND ORDER

----oo0oo----

This matter comes before the court on defendant Alameda County Medical Center's ("ACMC") motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff Sunstone Behavioral Health, Inc. ("Sunstone") opposes the motion. For the reasons set forth below,[1] defendant's motion is DENIED.

---

[1] Because oral argument will not be of material assistance, the court orders this matter submitted on the briefs. E.D. Cal. Local Rule 78-230(h).

## BACKGROUND[2]

Plaintiff Sunstone establishes, operates, and manages programs that provide mental health services to treat psychiatric disorders. (1st Am. Compl. ("FAC"), filed Feb. 14, 2007, ¶ 3.) Defendant ACMA operates general acute care hospitals with outpatient psychiatric programs in San Leandro, California (the "Fairmont" facility) and Oakland, California (the "Highland" facility). (Id. ¶ 4; SDF ¶ 1.)

**A.  The Agreement**

On or about August 3, 2004, Sunstone and ACMC entered into a written Outpatient Psychiatric Consulting Contract (the "Agreement") for the Fairmont and Highland facilities. (PUF ¶ 1; SDF ¶ 1.) The Agreement was for a thirty-six month term beginning on August 3, 2004, and expiring on August 2, 2007. (PUF ¶ 1; SDF ¶ 1.) The Agreement provided that Sunstone would "cause to be furnished services necessary to assist in [ACMC's] governing policies, practices, and procedures." (SDF ¶ 3; Ex. A to Decl. of Dewey Greene in Supp. of Pl.'s Opp'n ("Greene

---

[2] Unless otherwise noted, the facts recited herein are undisputed. (See Pl.'s Response to Def.'s Statement of Undisputed Facts ("PUF"), filed May 20, 2008). Where the facts are disputed, the court recounts plaintiff's version of the facts. (Response to Pl.'s Separate Stmt. of Additional Disputed Facts ("SDF"), filed May 30, 2008).

Plaintiff filed a motion to strike defendant's motion for summary judgment as untimely. While the court cautions defendant that it must comply with all court orders, including scheduling orders, there is no evidence that Sunstone was prejudiced by the late filing. Plaintiff's motion is DENIED.

Both plaintiff and defendant object to various pieces of evidence submitted by the opposing party. Having reviewed the objections, unless otherwise noted, the court finds the disputed evidence irrelevant to its determination or the objections otherwise without merit.

Decl."), filed May 20, 2008, at A-5.)  Specifically, the Agreement included services in the areas of:

    a. Operating policies and procedures;
    b. Program curriculum and development;
    c. Key monitoring systems;
    d. Staff training and continuing education;
    e. Quality assurance;
    f. Utilization management systems;
    g. Computer software programs to facilitate the administration of the Program;
    h. Assisting in [ACMC's] administration of the appeal of denied claims by third party payors with respect to services provided to patients of the Program;
    i. Operations analysis and support; and
    j. Other Program support as requested by [ACMC].

(SDF ¶ 3; Ex. A. to Greene Decl. at A-5.)

Pursuant to the Agreement, Sunstone was also to provide two Program Managers to assist in the administration of the Partial Hospitalization Program ("PHP") at the Highland facility and the Structured Outpatient Program ("SOP") at the Fairmont facility. (PUF ¶ 2.)  Each Program Manager was to be specifically accepted and approved by ACMC in advance.  (Id.)  Each Program Manager was to be available on a full-time basis.  (PUF ¶ 4.)  Sunstone was also to provide, on an as-needed basis, the consulting services of Sunstone's Regional Vice President, Director of Reimbursement, and Vice President of Quality Improvement (the "Off-Site Personnel").  From August 3, 2004 through August 2, 2005, ACMC was required to pay $25,583.33 each month per program location to Sunstone for Consulting Services.  (Ex. A to Greene Decl. at A-11.)  Beginning August 3, 2005, ACMC was required to pay Sunstone $23,541.67 each month per program location for these services. (Id.)

3

1    Either party had the right to terminate the Agreement upon
2 the failure of the other to comply with, or cure any breach or
3 default of, any material term, condition, or covenant of the
4 Agreement within thirty (30) days after written notice by the
5 terminating party to the other, specifying with particularity the
6 specific material term, condition, or covenant that had not been
7 performed or had been breached by the other party.  (PUF ¶ 8.)

8    From the inception of the Agreement until May 2006, ACMC
9 never sent any notice of default to Sunstone.  (SDF ¶ 9.)
10 Sunstone contends that prior to May 2006, no one at ACMC
11 complained to Sunstone about the quality of services provided.
12 (Id.)  Sunstone also contends that it never refused any request
13 from ACMC for management or operational assistance under the
14 Agreement.  (SDF ¶ 12.)

**B.   The New Management Team**

16    Within three months of the start of their employment with
17 ACMC in October 2005, the new management team of Wright Lassiter,
18 ACMC's CEO, and Bill Manns ("Manns"), ACMC's COO, started a
19 margin audit process to improve the "bottom line."  (SDF ¶ 13.)
20 As a result of the margin audit process, Sunstone was identified
21 as an area of improvement because Sunstone was earning a
22 significant profit and ACMC was paying a significant expense.
23 (SDF ¶ 14.)

24    On February 21, 2006, Manns wrote to Dewey Greene
25 ("Greene"), President of Sunstone.  The letter provided that
26 through the course of the audit, ACMC had "become painfully
27 aware" that its expenditures were greater than its income.  (SDF
28 ¶ 15.)  The letter also provided that ACMC believed "that the

cost of the contract is not tantamount to the services [ACMC] currently receive[s] and the cost of said contract is prohibitive." (Id.)  Therefore, ACMC stated that it "would like to end this consulting contract within the next 30 days in an effort to meet [its] cost containment goal." (Id.)  Manns contends that the purpose of the letter was "to explore the possibility of renegotiating the Agreement. (SDF ¶ 19.)  Gloria Jenkins ("Jenkins"), an ACMC employee with supervisory responsibility for the two outpatient psychiatric programs managed by Sunstone, testified that the purpose of the letter was to "end the contract." (SDF ¶ 20.)

When Leann Miller ("Miller"), the Regional Vice President of Sunstone at the time, learned of ACMC's intent to cancel the Agreement, she immediately met with Manns. (SDF ¶ 18.)  Manns told her that Sunstone's performance was not the issue; it was "strictly financial." (Id.)  Subsequently, on February 27, 2006, Greene wrote a letter to Manns, stating that the contract "expires on August 2, 2007 and that the Agreement contains no provision authorizing termination without cause." (SDF ¶ 22.)  ACMC did not respond to the letter. (SDF ¶ 23.)

On March 6, 2006, Sunstone became aware that ACMC was three months (90 days) behind on its payments owed to Sunstone. (SDF ¶ 24.)  That was the first time payments were late since the beginning of the contract. (Id.)

**C.   The Alleged Breach**

On or about April 28, 2006, ACMC employees complained of sexual harassment by Sunstone's On-Site Program Manager at the Fairmont facility, David Horne ("Horne"). (PUF ¶ 10.)

5

Specifically, employees complained to Manns of Horne's constant downloading and viewing of pornography both during and after work hours. (Id.) Staff complained that this activity had been going on for "several years." (Id.)[3] ACMC's investigation revealed that in the preceding six-week period alone, Horne had downloaded and viewed in excess of 10,000 pornographic images, including child pornography. (PUF ¶ 11.) ACMC believes that in the approximately one and one-half years Horne worked at the Fairmont facility, he downloaded and viewed over 100,000 pornographic images. (PUF ¶ 12.)

On April 27, 2006, after learning for the first time about the allegations regarding Horne's viewing of pornography, Miller called Jenkins to discuss the issue. (SDF ¶ 26.) Jenkins did not return her call that day. (Id.) On April 28, 2006, Greene called Horne to discuss the allegations. (SDF ¶ 27.) After Horne's initial denial, Greene informed him that an inspection of the computer hard drive would clear up the matter. (Id.) Horne asked for time over the weekend to think about the situation. (Id.)

On May 1, 2006, Jenkins returned Miller's call. (SDF ¶ 28.) Sunstone asserts that ACMC, through Jenkins, agreed to give Horne two weeks to depart and to have a hospital employee take over Horne's Program Director position on an interim basis while the job was posted. (Id.) That same day, Horne announced his intent to retire in an e-mail to Miller, copying Greene, Jenkins, and

---

[3] Plaintiff objects to this evidence as hearsay. However, it is not offered for the truth of the matter asserted. This is true for the majority of both plaintiff and defendant's hearsay objections. Plaintiff's objection is OVERRULED.

6

Barbara Cotton ("Cotton"), Sunstone's Program Manager for the Highland location. (SDF ¶ 29.) Horne stated that his retirement would be effective June 2, 2006. (Id.) After receiving the resignation, Manns e-mailed Greene, stating that he did not find a resignation effective in June to be acceptable. (SDF ¶ 30.) Jenkins testified that Mann's e-mail was ACMC's way of asking Sunstone to terminate Horne immediately. (SDF ¶ 31.) Greene immediately e-mailed and telephoned Manns. (SDF ¶ 32.) Greene informed Manns that Sunstone intended to remove Horne that week. (SDF ¶ 33.) Sunstone asserts that Manns and Greene discussed that Miller would be at the facilities to provide the necessary management and operational support until a replacement could be located. (Id.)

On May 2, 2006, Miller contacted Jenkins to advise her that Sunstone planned to cover Horne's position at the Fairmont location by using Cotton, the Highland Program Manager, with support from Miller. (SDF ¶ 36.) Sunstone asserts that Jenkins agreed with this plan. (Id.) Later that day, Horne resigned. (SDF ¶ 38.)

On May 4, 2006, Miler met with Jenkins and Cotton to discuss future coverage of the programs. (SDF ¶ 39.) Miller reiterated the plan to have Cotton temporarily cover Horne's position with Miller's support. Sunstone asserts that Jenkins again expressed agreement with this plan. (Id.) Miller also met with Manns and Cotton. (SDF ¶ 41.) Miller advised Manns of Sunstone's plan, including the realignment of a manager at Highland, Ed Vegilante ("Vegilante"), who would assist with clinical supervision during the transition period. (Id.) Sunstone asserts that Manns had no

7

objection to this plan. (Id.) During the meeting, Manns advised Miller that ACMC was preparing to send a notice of termination of the Agreement, but that he would delay sending the notice. (SDF ¶ 42.) Manns also mentioned that of the fifteen contractual agreements ACMC had, fourteen had agreed to terminate – all but Sunstone. (Id.)

On May 5, 2006, ACMC's General Counsel sent Greene a letter, stating that Sunstone had "materially breached the Agreement" because it "has failed to provide suitable and appropriate personnel" as required by the Agreement. (SDF ¶ 43.) The letter further stated that ACMC "intends to terminate the Agreement within thirty (30) days of the May 5, 2006 letter. (Id.)

That same day, Cotton circulated a memo to all staff that she would be covering both the Highland and Fairmont locations temporarily. (SDF ¶ 44.) The memo also provided that all clinical issues should be addressed to Vegilante. (PUF ¶ 15.) ACMC knew of the memo, but did not expressly object to Cotton's acting as temporary director. (SDF ¶ 45.) Subsequently, Cotton acted as a temporary Program Director for both sites with the help of Vegilante. (SDF ¶ 60.) Manns referred to Cotton as the "current program [d]irector" in an e-mail dated June 7, 2006. (SDF ¶ 61).

On May 10, 2006, Sunstone responded to the termination letter. Greene held a telephone conference with Manns, General Counsel for ACMC, and counsel for Sunstone. (SDF ¶ 46.) Sunstone offered an interim solution of having Cotton serve as Program Director at both the Fairmont and Highland facilities while a replacement was found, for a period not to exceed ninety

days.  (Id.)  During this time, Miller would support her.  (Id.)
Sunstone asserts that Manns stated no objection to this interim
solution.  (Id.)  ACMC asserts that Manns expressly rejected this
proposal.  (Id.; PUF ¶ 20.)  ACMC contends that Manns rejected
these options as ineffective because both the PHP and SOP
programs would be left with inadequate day to day management in
the interim.  (PUF ¶ 20.)  ACMC also contends that Manns
specifically informed Sunstone that Cotton was not qualified to
manage both programs because she was not a licensed clinician.
(Id.)  ACMC further contends that Manns requested that Sunstone
provide him information regarding Miller's qualifications to
serve as Program Manager, but that Sunstone has never provided
him with this information.  (PUF ¶¶ 21-22.)

On May 18, 2006, Greene wrote a letter to Manns, providing
that "[a] new program director acceptable to ACMC will be located
and Ms. Cotton will cease to serve as Temporary Program Director
in ninety (90) days or fewer."  (SDF ¶ 50.)  Greene also offered
to reduce the management fee by $8000 per month until a new
Program Director is located.  (Id.)  The letter concluded by
stating, "If you are not in agreement with our understanding that
this course of action is an effective resolution, please contact
me as soon as possible to discuss your concerns."  (Id.)

Sunstone actively pursued a replacement for the vacant
Program Director position, including interviewing proposed
candidates as early as the following week.  (SDF ¶ 54.)  Jenkins
admitted that it would probably take a month or more to find a
replacement when looking for an employee externally.  (SDF ¶ 52.)

9

Miller left multiple voicemails for Manns on May 23, 2006 and May 25, 2006, attempting to schedule a meeting with him on May 31, 2006 and to confirm the plan to have Cotton work as Interim Program Director for both locations with the support of Miller. (SDF ¶ 55.) On May 26, 2006, ACMC's General counsel responded to Greene's May 18, 2006 letter, rejected the proffered solutions, and stated that ACMC was terminating the Agreement, effective June 9, 2006. (SDF ¶ 56; PUF ¶¶ 27, 29.) Through this letter, ACMC informed Sunstone that the proposal did "not cure its material breach" and that the failure to provide qualified personnel acceptable to ACMC "goes to the very root of the consideration bargained for, and frustrates the very purpose of the agreement." (PUF ¶¶ 27-28.) On May 30, 2006, Miller again attempted to reach Manns to discuss the situation; Manns did not return her phone call. (SDF ¶ 57.)

On May 31, 2006, Miller met with Cotton and Jenkins. Sunstone contends that during the course of the meeting, Jenkins stated that the goal was to end the contract. (SDF ¶ 58.) That same day, Miller left another voicemail with Manns to set up a meeting. (SDF ¶ 59.) Again, Manns did not return her call and no meeting occurred. (Id.)

After June 9, 2006, ACMC refused to further discuss the issue or allow Sunstone to perform any services. (SDF ¶ 67.) ACMC contends that Manns' only consideration in deciding to terminate the Agreement was (1) his determination that Sunstone's conduct strongly suggested that it would not fully perform its contractual obligations anytime in the near future; (2) the negative impact on ACMC and its psychiatric patients of

10

Sunstone's failure to fully perform; and (3) the inadequacy of monetary damages to compensate ACMC and its patients for that harm.  (PUF ¶ 30.)

Sunstone contends that as of May 22, 2006, ACMC had already decided not to provide Sunstone it contractual period to cure. (PUF ¶ 29.)  On May 22, 2006, Manns sent an e-mail to ACMC's Human Resources Director regarding filling the job of program manager at each site.  (SDF ¶ 62.)  Manns and Jenkins continued to finalize the job description to be posted for both Program Managers.  (SDF ¶ 63.)  According to the Justification to Post, "hiring for this position will allow the medical Center to save much needed dollars currently paid to a contractor."  (SDF ¶ 64.) The Position Control Change Document, issued by ACMC on May 31, 2006, also stated that "[t]his position will be offset by the cancellation of the Sunstone contract."  (Id.)  As of June 1, 2006, Jenkins had already told ACMC's Director of Finance that the Agreement with Sunstone was terminated.  (SDF ¶ 65.)  On the same day, the final budget for ACMC was printed, reflecting the termination of the Agreement and reducing the budget for "Management Consultants" from $568,000 to zero.  (Id.)

After the termination of the Agreement, ACMC made Vegilante the interim Program Administrator.  (SDF ¶ 68.)  Vegilante now performs some of the same tasks that the Sunstone Program Managers performed and has offices at both locations; he splits his time between the two facilities previously covered by the Sunstone Program Managers.  (SDF ¶ 69.)  ACMC has been saving between $100,000 and $300,000 a year as a result of the termination of the Agreement.  (SDF ¶ 21.)

11

On November 22, 2006, plaintiff filed its Complaint for damages in this court for breach of contract and breach of the implied covenant of good faith and fair dealing.  Plaintiff filed its First Amended Complaint on February 14, 2007.  On May 25, 2007, ACMC filed a cross-claim for declaratory relief, alleging that Sunstone materially breached its obligations under the Agreement and that ACMC was justified in rescinding the Agreement.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  Fed. R. Civ. P. 56(c); see California v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998).  The evidence must be viewed in the light most favorable to the nonmoving party. See Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial."  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000). However, if the nonmoving party has the burden of proof at trial, the moving party only needs to show "that there is an absence of

evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325.

Once the moving party has met its burden of proof, the nonmoving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. See Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. See Nissan Fire & Marine, 210 F.3d at 1107. Instead, through admissible evidence the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

**ANALYSIS**

**A. Breach of Contract**

Defendant ACMC moves for summary judgment on plaintiff's claim for breach of contract on the grounds that Sunstone inexcusably failed to perform its duties under the contract, and thus, ACMC did not and could not breach the contract when it exercised its right of termination. Plaintiff Sunstone contends that the true reason for ACMC's termination of the Agreement was the financial situation it faced, not plaintiff's failure to provide a replacement Program Director. (First Am. Compl. ("FAC"), filed Feb. 14, 2007, ¶ 16.) Sunstone also alleges that it complied with all terms of the Agreement by immediately beginning a search for a new Program Director and putting a Temporary Program Director in place in the interim. (Id. ¶ 19.) Sunstone contends that by attempting to prematurely terminate the

1 Agreement and frustrating Sunstone's performance of the
2 Agreement, ACMC breached the Agreement.  (Id. ¶ 20.)
3      The central determination raised be ACMC's argument is
4 whether Sunstone, through its actions or inactions, materially
5 breached the Agreement.  "A bedrock principle of California
6 contract law is that 'he who seeks to enforce a contract must
7 show that he has complied with the conditions and agreements of
8 the contract on his part to be performed.'"  Brown v. Dillard's,
9 Inc., 430 F.3d 1004, 1010 (9th Cir. 2005) (quoting Pry Corp. of
10 Am. v. Leach, 177 Cal. App. 2d 632 (1960)).  Under California
11 law, "[t]he general rule is that if the breach is a material
12 breach, it may give grounds for the non-breaching party to cancel
13 the contract."  Comedy Club, Inc. v. Improv West Assocs., 514
14 F.3d 833, 847 n.12 (9th Cir. 2007) (citing Rano v. Sipa Press,
15 Inc., 987 F.2d 580, 586 (9th Cir. 1993)).  "Whether a breach
16 constitutes a failure of consideration sufficient to be deemed
17 material and thus to warrant rescission of a contract is a
18 question of fact . . . ."  Fed. Deposit Ins. Corp. v. Air Fla.
19 Sys., Inc., 822 F.2d 833, 840 (9th Cir. 1987) (citing Calabrese
20 v. Rexall Drug & Chem. Co., 218 Cal. App. 2d 774 (1963);
21 Bonadelle Constr. Co. v. Hernandez, 169 Cal. App. 2d 396 (1959)
22 (substantial performance is a question to be determined case-by-
23 case, based on the particular facts and circumstances)); see
24 Whitney Inv. Co. v. Westview Dev. Co., 273 Cal. App. 2d 594, 601
25 (1969) ("Whether a breach is so material as to constitute cause
26 for the injured party to terminate a contract is ordinarily a
27 question for the trier of fact.").  Factors to consider in
28

1  determining whether a failure to fully perform constitutes a
2  material breach of the contract include,
3      (1) The extent to which the injured party will obtain
        the substantial benefit which he could have reasonably
4      anticipated; (2) the extent to which the injured party
        may be adequately compensated in damages for lack of
5      complete performance; (3) the extent to which the party
        failing to perform has already partly performed or made
6      preparations for performance; (4) the greater or less
        hardship on the party failing to perform in terminating
7      the contract; (5) the wilful, negligent, or innocent
        behavior of the party failing to perform; and (6) the
8      greater or less uncertainty that the party failing to
        perform with perform the remainder of the contract.
9
10 Sackett v. Spindler, 248 Cal. App. 2d 220, 229 (1967).
11      While ACMC concedes that the materiality of a breach is a
12 question of fact, it asserts that the determination in this case
13 may be made by the court on a motion for summary judgment because
14 the facts are undisputed.  ACMC is incorrect.
15      In this case, the underlying facts are vigorously disputed.
16 Sunstone presents evidence that its obligation to provide Program
17 Managers was only one part of a much larger comprehensive
18 services contract.  Further, Sunstone presents evidence that it
19 had a plan to provide coverage for Horne's vacant position by
20 having Cotton serve at both locations with the support of Miller
21 and Vegilante.  Thus, Sunstone contends that ACMC would still
22 have received the substantial benefit of the contract despite its
23 inability to immediately fill the vacant Program Manager
24 position.  Sunstone also presents evidence that ACMC might have
25 been compensated for lack of complete performance because it
26 agreed to reduce its monthly fee by $8000 to compensate for the
27 temporary arrangement.  Sunstone also presents evidence that it
28 attempted to maintain contact with ACMC to negotiate a solution,

it continued to search for a replacement for Horne, it proposed a plan to substitute coverage while a replacement was sought, and it offered to lower the price of the contract in the interim.  As such, Sunstone has presented evidence that it was attempting to perform or, at the very least, preparing to perform under the Agreement until it was terminated.

Sunstone presents evidence that it acted in good faith in attempting to remedy the breach caused by Horne's conduct and subsequent resignation.  It was in immediate and continuous contact with ACMC throughout May and June 2006.  It proposed potential alternatives to ACMC, including reducing the contract price while a new Program Manager was sought.

Moreover, Sunstone has presented evidence from which a trier of fact could infer that ACMC's actions in repudiating the contract were pretextual and taken in bad faith.  In February 2006, ACMC represented that the cost of the contract was "prohibitive" and that it sought to terminate the consulting contract in 30 days.  In March 2006, Sunstone became aware that ACMC was three months behind in the payments owed under the Agreement.  ACMC's conduct in May 2006, after Horne's resignation, could be interpreted by a trier of fact as evincing an intent to cancel the Contract regardless of any attempt by Sunstone to cure the breach.  The budget, drafted and printed before the 30 days had expired, reflects the cancellation of the contract.  According to Sunstone's evidence, ACMC failed to expressly object to the proposed plan that involved Cotton covering both facilities when it was initially proposed and implicitly validated the plan by allowing Cotton to serve at both

16

facilities and referring to her as the current program director. ACMC also allegedly failed to respond to communication regarding the negotiation of a satisfactory plan. Subsequently, after the contract was terminated, ACMC has saved at least $100,000.

ACMC disputes most of these facts and the inferences that Sunstone seeks to be drawn from them. However, such disputes require determination by a trier of fact and cannot be resolved by the court on a motion for summary judgment. Therefore, defendant ACMC's motion for summary judgment regarding plaintiff Sunstone's claim for breach of contract is DENIED.

**B.   Breach of the Implied Covenant of Good Faith and Fair Dealing**

Defendant ACMC also moves for summary judgment on plaintiff's claim for breach of the implied covenant of good faith and fair dealing on the grounds that it was justified in terminating the contract because Sunstone did not cure its material breach within thirty days as set forth in the Agreement. Plaintiff Sunstone contends that ACMC breached the implied covenant of good faith and fair dealing through its pretextual scheme to terminate the Agreement.

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Acree v. Gen. Motors Acceptance Corp., 92 Cal. App. 4th 385, 393 (2001) (quoting Rest. 2d Contracts § 205). "Broadly states, that covenant required that neither party do anything which will deprive the other of the benefits of the agreement." Edmond's of Fresno v. MacDonald Group, Ltd., 171 Cal. App. 3d 598, 605 (1985) (quoting Seaman's Direct Buying Serv., Inc. v. Standard Oil Co.,

17

36 Cal. 3d 752, 768 (1984)). "Where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." Helfand v. Nat'l Union Fire Ins. Co., 10 Cal. App. 4th 869, 906 (1992) (quoting Spindle v. Travelers Ins. Companies, 66 Cal. App. 3d 951, 958 (1977)). "An arbitrary cancellation is a breach of the covenant of good faith and fair dealing." Id.

As set forth above, there are triable issues of fact regarding whether Sunstone materially breached the contract. There are also triable issues of fact regarding whether ACMC's conduct in repudiating the contract was pretextual and not done in good faith. Therefore, for the reasons set forth in the court's analysis of defendant's motion for summary judgment regarding the breach of contract claim, defendant ACMC's motion for summary judgment regarding plaintiff Sunstone's claim for breach of the implied covenant of good faith and fair dealing is also DENIED.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is DENIED.

IT IS SO ORDERED.

DATED: June 18, 2008

FRANK C. DAMRELL, Jr.
UNITED STATES DISTRICT JUDGE